**SO ORDERED.**

**SIGNED this 09 day of January, 2006.**



_____
        ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE
_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **BROADVIEW HOSPITALITY HOLDINGS, LLC** | ) | **Case No. 04-16882-11** |
| | ) | |
| **WICHITA HOSPITALITY HOLDINGS, LLC** | ) | **Case No. 04-16883-11** |
| | ) | |
| **WICHITA REALTY, LLC** | ) | **Case No. 04-16884-11** |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| **WICHITA HOSPITALITY HOLDINGS, LLC;** | ) | |
| **WICHITA REALTY, LLC; and BROADVIEW** | ) | |
| **HOSPITALITY HOLDINGS, LLC,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | **Adv. No. 04-5348** |
| | ) | |
| **MORDECHAI BOAZIZ,** | ) | |
| Defendant | ) | |
| v. | ) | |
| | ) | |
| **PROSPER LEVY; PJDYH, LLC; and** | ) | |
| **OVADIA OVED,** | ) | |
| Third Party Defendants. | ) | |
| _____ | ) | |

1

**MEMORANDUM OPINION**

The Court held a trial on this matter on October 24-26 and 28, 2005. After hearing three days of testimony and receiving over 150 exhibits into evidence, the Court took the matter under advisement. After an extensive review of the evidence, designated deposition testimony, and the parties' stipulations, the Court has considered the statements and trial briefs of counsel and is now prepared to rule.

I.     Introduction

The plaintiffs in this adversary proceeding, Broadview Hospitality Holdings, LLC ("Broadview"), Wichita Hospitality Holdings, LLC ("Hospitality"), and Wichita Realty, LLC ("Realty") (collectively referred to as the "LLCs") are debtors in three separate chapter 11 cases pending in this Court. Each company owns a hotel located in Wichita, Kansas. The Broadview operates the Broadview Radisson Hotel. Hospitality operates the Ramada. Realty operates what was formerly known as, and is referred to in the documents as the Sheraton. The plaintiffs initially sought to remove and enjoin defendant Mordechai Boaziz ("Boaziz"), a one-third owner and managing member, from managing and exerting further control over the LLCs. Now the LLCs and Boaziz seek a determination of the extent of the capital invested in the LLCs by Boaziz and the Levy Group, the two-thirds owner of each company. The Levy Group consists of Ovadia Oved and the wife and children of Prosper Levy, the initial two-thirds investor in the companies.[1]

In late 2001, Prosper Levy and Mordechai Boaziz agreed to acquire and operate three hotels

_____

[1] During the course of these proceedings some reference was made to PJDYH, a California limited liability company comprised of Prosper Levy's family members. At some point it appears that PJDYH succeeded to the interest of the Levy Group in the LLCs, but no evidence was presented at trial to this effect. *See* Ex. 99. Accordingly, for purposes of this opinion, the Court considers the Levy Group to be the owner of a 66.666% interest in the LLCs.

in Wichita, Kansas.  Their business relationship is loosely defined by a series of documents and an assortment of accounts of their conversations.  As with most "loosely-defined" enterprises, the Levy-Boaziz relationship that once had been based on their mutual cultural heritage, religious faith, and familial affection, broke down.  The hotels encountered financial difficulty almost from the start and, in late 2004, the LLCs each filed a separate chapter 11 case here.  The Levy Group claims a two-thirds membership interest in each of the LLCs.

After the chapter 11 cases were filed, the LLCs filed this adversary proceeding to obtain a restraining order removing Boaziz from management of the LLCs and hotels and to secure this Court's determination of the respective capital positions of the parties.[2]  The LLCs assert that Boaziz is short on his capital investment and seek a judgment against him for the shortfall.  Boaziz contends that the Levy Group is short and seeks to have the Levy Group's capital account reduced and the hotels sold.  Boaziz has also filed a third-party complaint against Levy and others, seeking indemnity for any judgment that may be entered against him here.   Because the hotels continue to struggle financially, even under the Court's protection, time is of the essence in determining who owns and owes what so that the LLCs may formulate and propose chapter 11 plans.  Therefore, the Court severed the third party complaint from the main proceeding.  The matter of the parties' capital positions proceeded to trial.

II.     Jurisdiction

This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), and (O) over which the Court

---

[2]  After reviewing the LLCs' application and hearing testimony, the Court issued a temporary restraining order on December 17, 2004. *Dkt. 4.*  The temporary restraining order was later dissolved on December 27, 2004 when the parties agreed to the interim designation of the Levy Group as the managing member of the LLCs.  As part of that agreed order, Boaziz was to provide an accounting of the capital contributions to the Levy Group. *Dkt. 16.*

3

has jurisdiction pursuant to 28 U.S.C. § 157(b)(1) and § 1334(b).

III.     Facts

    A.     The Relationship and Course of Dealing of the Parties

Prosper Levy lives in Israel with his wife, Rosa.  Mr. Levy is about 75 years old.  He speaks Hebrew and French and can write in each language.  He does not speak or read English.  Owing to his ill health, Mr. Levy did not attend the trial or give his deposition.  Rosa is a citizen of France and is also in her 70's.  She is fluent in French and somewhat so in Hebrew.  Both the Levys have at best a rudimentary education.  Notwithstanding this, they appear to have amassed considerable wealth, having invested over $15 million cash in the hotel ventures that are the subject of this action.

Ovadia Oved is an Iraqi who immigrated to the United States in 1970 and lives in Los Angeles.  Oved is not related to the Levys but has been a close family friend for several years.  Oved met Prosper in 1999 or 2000 through a common friend in Los Angeles.  Oved was involved in real estate development.  Oved is fluent in Hebrew and fairly fluent in English.  He speaks no French.  From time to time, Oved would present the Levys with investment opportunities.  In 2001, Oved visited the Levys in Tel Aviv.  During this visit to the Levys in Israel, he acquainted them with an investment opportunity in the three hotels in Wichita, Kansas: the Broadview Radisson, the Ramada, and the Sheraton.  Oved became aware of this investment opportunity through his contacts with Mordechai Boaziz.  Oved and Boaziz met through their synagogue and became close friends.

Born in Israel, Boaziz resides in Miami, where he pursues various investment opportunities, mostly involving the hospitality and lodging industry.  Boaziz is fluent in Hebrew and English.  Oved had worked with the Levys before and when Boaziz pitched the hotel deals to him, he relayed it to the Levys.  Boaziz and Oved communicated at all times in Hebrew.

Boaziz had acquired the three hotels in early 2001 through foreclosure. Boaziz wrote Oved a letter in October , 2001, setting out in detail what an investment in each of the three hotels might cost. Oved shared the letter with the Levys and, in October of 2001, they came to America in part to view the hotels and meet Boaziz. The Levys met with Boaziz and Oved in Wichita and toured the properties. Then they all flew to Miami where Boaziz introduced the Levys to his family and struck up a fast friendship based upon the Levy's and Boaziz's common Moroccan heritage and Orthodox Jewish faith. Boaziz's parents are in their 70's and thus contemporaries of the Levys. Boaziz's parents and Prosper Levy are all Moroccan-born. Rosa Levy, Oved, and Boaziz all testified that the Levys and the Boaziz family immediately became very close. Prosper treated Boaziz "like a son" and, in turn, Boaziz drove Prosper Levy places, took him to dine, and spent the High Holidays with his family.

As a result of this remarkable bonding, the Levys were most receptive to Boaziz's proposed investment opportunity. While a more detailed analysis of the Boaziz-Levy deal will follow, their bargain, stripped of all legal overtones, can best be described as Prosper Levy acquiring a two-thirds interest in the hotels, with Boaziz keeping one-third. Prosper Levy was to pay cash for the acquisition of his interest, fund renovations to the properties, pay off pre-existing mortgages, and cover any "carry" – the operating losses that were anticipated during the period of renovations. Prosper understood that part of his funds would be used by Boaziz to buy out his two current one-third "partners" in the Radisson and Ramada properties, Topaz Investments and Abe Franco.[3] Also, to enable Boaziz to acquire a full one-third interest, Levy would infuse eighty percent of the

_____

[3] The cost of the buyout of Topaz and Franco was never disclosed to The Levy Group during the negotiations or prior to consummation of the deal.

5

necessary capital, in effect "lending" Boaziz 13 1/3 percent of Boaziz's capital. This arrangement was agreed upon after the series of meetings in Wichita and Miami at which Prosper and Boaziz spoke Hebrew and Oved took notes which are partially in English and partially in Hebrew.[4]

At some point during the Miami meeting, someone drew up an agreement and Prosper and Boaziz signed it. Rosa Levy was present at all these meetings and discussions and was able to describe what occurred in her testimony. The agreement was executed November 10, 2001 and covers the Radisson and Ramada.[5] A separate agreement, undated, but apparently not signed until February of 2002, set forth essentially the same terms with respect to the Sheraton.[6] Neither lawyers nor accountants participated in the negotiations or the drafting of either agreement. Astonishingly, the Levys did not request or review any financial records or operating reports for any of the hotels prior to their investment. The agreements are in English and, according to those present, Boaziz explained their contents to the Levys in Hebrew.

Thereafter, Prosper Levy began to transfer money to Boaziz's personal bank account. Rosa Levy and Boaziz both testified that this was done at Boaziz's request. Rosa Levy said that no suspicion or misgiving attached to this course of business because of the affection the Levys had for Boaziz and their implicit trust in him to take care of the hotels in their best interest. They continued to send money, paying in over $9.2 million to Boaziz between November 10, 2001 to March 1,

---

[4] *See* Ex. 19.

[5] Ex. 23. Under the November 2001 Agreement, Prosper Levy was to transfer $6.4 million for the Radisson and Ramada.

[6] Ex. 41. Under the February 2002 Agreement, Prosper Levy was to transfer $2.8 million for the Sheraton.

6

2002.[7] How that money was spent and whether it was done for the benefit of the LLCs is one of the lingering questions in the case. Boaziz did not provide the Levys with periodic written accountings; rather he kept them updated through weekly Friday phone calls made before the Sabbath. According to Rosa Levy, these calls frequently included requests for more money to be sent to Boaziz's Miami accounts so that the hotels could remain in operation. Rosa Levy would nearly always be on the telephone with Boaziz and Prosper and would discuss the conversation with her husband afterwards. Ultimately, Levy paid in some $14.1 million in cash and received a credit from Boaziz of $333,000 concerning a separate investment deal the two had in Florida.

As time passed and the Levys received no return on their investment, they began to ask for more detailed financial information. According to Rosa Levy, Boaziz grew less responsive, but when he did communicate, it was usually to request money. Levy sent Oved to Wichita to check on the properties and meet with Boaziz, but these meetings were also fruitless. Boaziz agrees that he frequently and justifiably requested funds from the Levys but disagrees vehemently that he denied the Levys any information they requested.

In the spring of 2002, Prosper Levy decided to transfer some of his holdings to his wife and children. The Levys and their son, Henri, visited Wichita in May of 2002 and met with Michael L. Jones, a Wichita attorney, who sometimes represented Boaziz and the hotels. After these meetings, Mr. Jones prepared a fresh set of agreements which were designed to split Prosper's interest in the hotels into shares for each of his children and his wife.[8] Henri Levy is a French national who was living in Paris in 2002. He speaks French and Hebrew and has a limited facility in English. The

---

[7] Ex. 28.

[8] Ex. 56, 57 and 58.

7

family also met with another Wichita lawyer to discuss possibly obtaining a visa for one of the Levy family members to remain in this country to monitor the Levys' American interests.

By late 2002, the Levy-Boaziz relationship had cooled. The hotels continued to struggle financially. Prosper Levy asked Henri to come to America to supervise his investments here. Henri moved to Los Angeles and with Oved, attempted to arrange to co-manage the hotels. In this time period, Henri Levy requested that Boaziz assure that the LLCs' tax returns reflect a share of the losses going to the Levy Group. This led to a discovery by Henri that Boaziz had never disclosed the Levy Group's interest on the returns. After some discussion, the hotels' accountant, David Adams, prepared and filed amended tax returns for 2001 and 2002, allocating some of the considerable losses of the hotels to the Levy Group.

In September of 2003, Oved learned that the two existing mortgages on the Ramada and Sheraton, for which Prosper had advanced funds under the November 2001 and February 2002 Agreements, had not been paid off by Boaziz. Oved further discovered that Boaziz had given new mortgages to Sunflower Bank in late 2002, representing himself as the sole member and owner of the LLCs.

When Boaziz resisted Oved's and Henri's efforts to become more active in the operation of the hotels and to obtain information, litigation ensued. In the fall of 2004, Boaziz obtained a state court injunction to bar Henri and Oved from the hotels. In turn, acting as majority members of the three LLCs, the Levy Group caused them to file for chapter 11 protection and they commenced this adversary proceeding. This Court entered a temporary restraining order effectively removing Boaziz from management and placing the properties in the Levy Group's control on December 17, 2004.[9]

---

[9] *Dkt. 4.*

B.    The LLCs.

Boaziz acquired the three hotels in early 2001 through foreclosure sale.  When he did so, he established three Kansas limited liability companies to hold them.[10]  Boaziz was the manager of each LLC and was shown as the sole owner and member.  The operating agreements for Broadview and Hospitality (owning the Radisson and Ramada, respectively) were signed January 18, 2001 and are identical.[11]  The May 2001 operating agreement for Realty, which owns the Sheraton, is similar, but contains  different provisions concerning the dilution of capital where a member has failed to meet a capital call.[12]  Each operating agreement indicates that Boaziz owns a 100 percent distribution percentage.  No certificates of good standing were placed in evidence, but neither party suggests that the LLCs are not in good standing.

With regard to capital contributions, the Broadview and Hospitality operating agreements recite the following:

> Section 3.03.  Additional Capital Contributions.  No Member shall be required to make additional capital contributions to the Company unless such Member, along with all of the other Members, consents thereto. Notwithstanding the foregoing, if Members constituting 80% of the "Distribution Percentage Interests" as such may be set forth on Schedule A from time to time, approve such capital contributions, they shall determine the amount of additional capital required from those who choose to participate.  In the event that one or more members do not contribute the required additional capital in the reuired [sic] time and manner, such non-contributing Member shall have his ownership interest in the Company diluted.  Such dilution shall be accomplished by adding to each contributing Member's Distribution Percentage and [sic] additional 10% of his newly contributed capital contribution.

The Realty operating agreement instead recites:

---

[10]  Wichita attorney Michael L. Jones, who was also the resident agent for the LLCs, drafted the LLC formation documents.

[11]  Ex. 2 and 3.

[12]  Ex. 4.

9

Section 3.03. <u>Additional Capital Contributions</u>. The Manager shall have absolute discretion regarding the amounts and timing of additional capital contributions required of the Members, including himself. In the event that one or more Members do not contribute the required additional capital in the required time and manner, such non-contributing Member shall have his interest in the Company diluted.

Both versions of the operating agreements provide that the LLC maintain capital and distribution accounts as well as complete books for the LLC. Had this been done, a good deal of the controversy now before the Court might have been avoided.

At the time Boaziz invited the Levy participation in the hotels, he did not hold 100 per cent of the distribution percentage rights of the Broadview or Hospitality LLCs. Indeed, Topaz Hospitality, LLC owned one-third of each company and Abe Franco owned the other one-third in each company. Both Boaziz's and Rosa Levy's testimony suggest that Levy money would be used to acquire these interests, even though Rosa Levy felt they could have made a better deal by dealing directly with the old investors. Nevertheless, it was Prosper Levy's desire that Boaziz secure the interests. From the documentary evidence, it appears that Boaziz made a series of payments to Topaz and Franco between 2001 and 2003, but did not secure an assignment of either of their interests until later in 2003. All that is in the record on this point are checks paid by Boaziz to Topaz and Franco and a letter from Topaz acknowledging receipt of payments and reciting that Topaz's interests have been transferred "to Mordechai Boaziz."[13] There is no similar documentation concerning transfer of Franco's interest, but the parties agree that said transfer did occur. It is also undisputed that Boaziz did not disclose to the Levy Group the 'buyout' price for the Topaz and

---

[13] Ex. 123 reflects that Boaziz paid a total of $4,095,000 to buyout Topaz and Franco. The Court notes that the consideration paid for Topaz's interest in the two LLCs differs between Boaziz's schedule of payments ($2,455,000) and Topaz's acknowledgment ($2,300,000).

Case 04-05348    Doc# 137    Filed 01/09/06    Page 10 of 39

Franco interests.[14]

The operating agreements for the three LLCs were drafted by attorney Jones in early 2001. Jones did not know of the existence of Topaz and Franco and, at the time he met with the Levy Group in the spring of 2002, he did not know that they had ever become members of the LLCs or acquired interests in them. He testified that, to his knowledge, Boaziz was the only member of the LLCs.

C.      The Parties' Agreements

Levy and Boaziz first entered into discussions concerning the hotel properties in October of 2001. Boaziz had previously supplied a prospectus on each of the properties to Oved who, in turn, showed them to Prosper.[15] Each prospectus was in English and Oved apparently interpreted or described the contents to Prosper in Hebrew. After the Levy Group visited Wichita in the fall of 2001 and toured the hotel properties, they met further with Boaziz in Miami where the parties discussed their investment arrangement which, according to Oved's contemporaneous notes,[16] was as follows.

The Radisson would be acquired for $7,500,000, 3 million cost and 4.5 million for repairs or renovations. Of that amount, $2.5 million would be financed by a third party, leaving a $5 million investment from Boaziz and the Levys. According to Boaziz, another $700,000 would be necessary to "carry" operations while the renovations were under way. Of the $5.7 million, Boaziz would pay 20 per cent, or 1.14 million while Levy would pay the difference $4.56 million. Levy

---

[14] According to the parties' stipulation of facts, Topaz and Franco invested $3,450,000 in the two hotels during 2001. *Dkt. 127*, Stipulation of Fact, ¶ 2.

[15] Ex. 5, 6 and 7.

[16] Ex. 19.

11

would also have the option to refinance the existing mortgage of $2,560,000 against the property by paying it in full.

The Ramada would cost $3.0 million with needed renovations of $1.5 million for a total of $4.5 million.  Of the $4.5 million, $2.5 million would be financed.  An additional $300,000 "carry" for operating expenses would be necessary.  Boaziz's 20 percent share of this project would be $460,000 while Levy's 80 percent would be $1.84 million.  There was an existing $2,610,000 mortgage against the property.

The Sheraton would be acquired at a cost of $2.5 million and needed repairs of $500,000.  Of this $3.0 million, $2.0 million would be financed, leaving $1.0 million to be covered by the investors, along with anticipated expenses and further renovations of $2.5 million.  Boaziz's 20 percent share of the $3.5 million would be $700,000 and Levy's 80 percent share would be $2.8 million.  There was a $2,000,000 mortgage against the Sheraton.

In short, the parties discussed the acquisition of these hotels prospectively when, in fact, Boaziz already owned them subject to pre-existing mortgages.  His prior ownership creates a legitimate question whether the parties intended the "sale" to Levy to be a sale of Boaziz's interests or a sale of shares in the LLC entities.  The parties stipulate that they intended Levy to hold 66.666 percent of the entities and Boaziz to hold 33.333 percent.  By allowing Boaziz to contribute only 20 percent, Levy essentially agreed to finance Boaziz's acquisition of the other 13.333 percent.

On November 10, 2001, Levy and Boaziz signed an agreement concerning the Radisson and the Ramada.[17]  Later, in February of 2002, they signed a further agreement pertaining to the Sheraton.[18]  These are referred to here as the "First Agreements."  Levy entered into this substantial

---

[17]  Ex. 23 (the "November Agreement").

[18]  Ex. 41 (the "February Agreement")..

investment based almost exclusively on his trust of Boaziz, without reviewing any financial records of the LLCs, without an independent appraisal of the properties, and without legal advice from an attorney. But for the names of the properties and the dates the agreements were signed, they are substantially identical. The form of these agreements, reproduced in their entirety, states as follows:

## AGREEMENT

This is an agreement between Mordechai Boaziz and Propser [sic] Levy. Mordechai Boaziz is the President of Broadview Hospitality LLC. Broadview Hospitality LLC is the owner of the Radisson Hotel located at 400 West Douglas in Wichita, KS 67202. Furthermore, Mordechai Boaziz is the President of Wichita Hospitality LLC that owns the Ramada Hotel located at 7335 Kellogg in Wichita, KS 67207. By this agreement, Mr. Prosper Levy will become a 66.666 percent shareholder of both of these LLC's, and Mordechai Boaziz will own the remaining 33.333 percent in each of these LLC's. In order to satisfy this agreement, Mr. Propser [sic] Levy will transfer the amount of 6,400,00.00 [sic] dollars to the account of Mordechai Boaziz (on behalf of the company).

This money that is being transferred, will satisfy the buy-out of the other current partners in both of these LLC's as well as the funds necessary to complete both of these projects by December 3, 2001. As part of this agreement, each shareholder will receive 10 percent of their equity capital on a yearly basis beginning July 1, 2002.

As part of this agreement, Mordechai Boaziz will receive 10 percent of all profits (operating as well as sale of project) in an exchange for him putting the deal together and operating the properties. As part of this agreement, Mordechai Boaziz will not receive any compensation or salary for his operating of both of these properties. This contribution of 10 percent due to Mordechai Boaziz will be given before any profits are distributed to the other shareholder of both LLC's.

As part of this transaction, Mr. Prosper Levy will also pay off both First Mortgages that exist on the ~~Broadview hospitality LLC in the amount of $2,560,000.00 two million five hundred and sixty thousand dollars as well as the~~ First Mortgage that exists on Wichita Hospitality LLC in the amount of 2,610,000.00 two million six hundred and ten thousand dollars. By doing so, Mr. Propser [sic] Levy will hold the First Mortgages on both properties at ~~8~~ percent interest for a period of 25 years amortization with a balloon of 10 ten years.[19]

_____

[19] A handwritten notation indicates that the substitute mortgage to be held by Levy on the property would be at 10 percent interest rather than 8 percent.

13

| /s/ Mordechai Boaziz     11/10/2001 | /s/ Prosper Levy          11/10/2001 |
|---|---|
| Broadview Hospitality LLC      Date | Prosper Levy                      Date |
| Mordechai Boaziz | Individual |
| President | |

| /s/ Mordechai Boaziz        11/10/2001 | /s/ Ovadia Oved          11/10/2001 |
|---|---|
| Wichita Hospitality LLC       Date | Witness                          Date |
| Mordechai Boaziz | |
| President | |

/s/ Ovadia Oved          11/10/01
Witness                          Date

The First Agreements are signed by Boaziz as president of the respective LLCs and Prosper Levy as an "Individual." The agreements stipulate that Levy will become a 66.666 percent shareholder while Boaziz will have a 33.333 percent share. The agreements recite that the money being paid by Levy will serve to acquire the interests of Topaz and Franco and to complete the projects by December 31, 2001. The funds are also to be used to pay off the Ramada mortgage in exchange for which Levy is to be granted a mortgage of his own. Interlined on the bottom margin of the agreement is an "option" for Levy to acquire, on the same terms, the Sheraton. The February agreement effectuates that acquisition, but provides for the transaction to be completed by February 30 [sic], 2002.

There is considerable dispute over who drafted the First Agreements. Jones, the attorney retained by Boaziz to draft the LLC organic documents, had no involvement in drafting the First Agreements, and was completely unaware of the Levy-Boaziz transaction. Oved testified that Boaziz drew them in his offices in Miami. Oved identified the handwritten notations and initials of Boaziz on the November agreement, including a Hebrew notation signifying to Oved that Boaziz prepared them. Boaziz says Oved drew them up in Miami. Both Boaziz and Oved claim that they

cannot type. Rosa Levy believed that Boaziz drew the agreements. All agree that Boaziz explained these agreements to Prosper in Hebrew. There are other documents in the record drafted by Boaziz and it appears to the Court to be more likely than not that he was the scrivener. The structure of the transaction is fairly consistent with the October 17 correspondence authored by Boaziz.[20] And in the stipulations of fact, the parties stipulate that the November 10 agreement "was prepared at the direction of Boaziz and given to Oved."[21]

In the spring of 2002, Levy decided to divide up his Wichita investments among his wife and children and Oved. He told Boaziz how the Levy two-thirds share should be divided and Boaziz agreed to have a document drafted that would effect that distribution. While visiting Wichita in May of that year, Levy and Boaziz consulted with Boaziz's Wichita lawyer, Jones. Attorney Jones drafted three agreements (one for each LLC) covering the division of the Levy interests. On May 9, 2002, Levy and Boaziz signed these three documents (referred to here as the "Second Agreements").[22] Jones testified that when he was drafting the Second Agreements, he had no idea that Boaziz and Prosper had already consummated the purchase of the interests described in them. He believed that Boaziz still owned 100 percent of the LLCs and that the Second Agreements would effect a sale by Boaziz of two-thirds interest to the Levy Group. According to Rosa Levy and Oved, Prosper thought that the Second Agreements were simply restatements of the First Agreements, necessitated by Levy's desire to distribute his interests to his family. Because neither Prosper nor Rosa Levy could read English, Boaziz translated them into Hebrew and, according to Rosa Levy, he made it appear that the only thing the Second Agreements changed was the distribution of interest

---

[20] Ex. 16.

[21] *Dkt. 127*, Stipulation of Facts, ¶ 6.

[22] Ex. 56, 57 and 58.

percentages.

Despite Boaziz's assurances to Prosper, the Second Agreements differ materially from the First Agreements in several ways. They provide that Levy seeks to "purchase an ownership interest in the [LLCs]," when in fact he had already done so. They also specify that Boaziz will remain the manager of the LLCs and that all the new members will be bound by the Operating Agreements of the LLCs. They also state that each new member authorizes Boaziz to sign and approve any operating agreements in their behalf. The Second Agreements clarify that the 10 percent fee to be paid to Boaziz will come from operating profit and the sale of the properties. Notably, they also provide that "Boaziz will cause to be issued certificates of ownership in and to [the LLCs]" to the Levy group for a total ownership interest of 67 percent. Finally, the Second Agreements stipulate that their provisions take precedence over any contrary provisions in the operating agreements.

### D.    Payments by the Levy Group

Immediately upon signing the First Agreements, Prosper began to forward funds to Boaziz. The parties stipulate that by June of 2002, Prosper paid to Boaziz a total of $13.1 million cash. Of this cash, $3.1 million was paid after the signing of the Second Agreements.[23] Boaziz gave Prosper credit on another project in the amount of $330,000, which credit was applied to the Wichita projects, making Levy's total investment $13.430 million. These payments were sufficient to satisfy Prosper's obligation to pay $6.4 million for the Broadview Radisson and the Ramada plus his $2.8 million obligation on the Sheraton. This left $4,230,000 to be applied to the existing mortgages on the Ramada ($2,610,000) and Sheraton ($2,500,000) that Levy had agreed to pay. In late 2002, Levy advanced an additional $1 million. Although susceptible to multiple interpretations, the evidence suggests that Boaziz spent at least some of this money on the hotels. He did expend in

---

[23] *Dkt. 127*, Stipulation of Facts, ¶ 12.

16

excess of $2.3 million to buy out Franco and Topaz. He did not pay off the existing mortgages. Instead, in November, 2002, he refinanced the pre-existing mortgages with loans at Sunflower Bank.[24] In doing so, he represented to Sunflower Bank that he owned 100 percent of the LLCs and did not disclose the existence of the Levy interests. The Bank did not know of those interests until the Levy group took over operations in 2003.

### E.  Payments and Use of Money by Boaziz

Both the LLCs and Boaziz presented expert accounting testimony on the issue of the sufficiency of capitalization of the LLCs by each party. The accountants' reports are close in their statement of what Boaziz contributed of his own funds into the companies. In total, he contributed between $5.867 million and $5.88 million. Both reports essentially take at face value his assertion that these funds were his own, and not those of the Levys. When Boaziz would make a payment for renovations or operations, he would direct a wire transfer from his bank in Miami to one of the Wichita hotels. He would then direct the hotel to write a check to the appropriate vendor. The hotels' controller, Rudea Lupton, testified that she adhered to a system whereby she would not credit Boaziz's account with these payments until he provided her with an invoice or statement from the particular vendor. Both the Levy accountant and Boaziz's accountant accepted these renditions as recorded by Boaziz's Miami accountant Ronen Ben-Haroush, and based their forensic reports on them.

Boaziz, Rosa Levy and Oved all agreed that Prosper paid Boaziz money for whatever use Boaziz deemed fit, so long as the money went into the hotels in some fashion. It is not entirely clear that he could have refinanced all of the mortgages with what the Levy group paid alone. At the

---

[24] Boaziz refinanced the mortgages at 6.25 per cent interest and executed personal guarantees of the indebtedness.

same time, it does appear that out of the approximately $20 million paid by both parties, sufficient funds were present to refinance the mortgages. That Boaziz expended both the Levy funds and his own *and* incurred additional debt by refinancing the mortgages at Sunflower suggests the magnitude of the operating losses experienced by the properties.

The Court will reference the expert accountant reports further in its analysis of the claims and other facts as may be applicable to the discussion.

IV.    Analysis

At the core of the dispute here is the extent to which the respective members of the LLCs are under- or over-subscribed to capital. Because Boaziz did not maintain capital accounts for the LLCs (notwithstanding his clear duty to do so under the Operating Agreements), the parties have been forced to reconstruct each LLC's finances in an effort to determine each member's capital contributions up to the date of filing, December 17, 2004. Reconstructing these accounts requires the accountants (and the Court) to characterize the sale transaction as either a sale by Boaziz of a personal interest to Levy or a sale of an interest in the LLCs by the LLCs to Levy. These alternative interpretations of the deal carry with them significant financial consequences, particularly to Boaziz. Thus, characterizing the transaction is the critical issue in resolving this case.

A.    Character of the Sale of LLC Interests

The First and Second Agreements are ambiguous.[25] Because of this ambiguity, the Court has considered the extrinsic evidence offered by the parties surrounding the transaction, in addition to

---

[25]  To be ambiguous under Kansas law, the Agreements must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of the language. *Simon v. Nat'l Farmers Organization, Inc.*, 250 Kan. 676, 680, 829 P.2d 884 (1992).

the language in the Agreements themselves.[26]  In examining the Agreements and the extrinsic

evidence, the Court is mindful of the cardinal rule of contract interpretation to ascertain the parties'

intent and to give effect to that intent.[27]  In addition, the rules of construction permit the Court to

construe the uncertain and doubtful provisions against Boaziz, whom the Court has found more

likely than not to be the drafter of the First Agreements.[28]

From the First and Second Agreements, as well as the testimony of the parties and of Oved,

the Court concludes that the LLCs have proven it more likely than not that the sales of the interests

were intended to be sales by the LLCs to Levy.  This is admittedly a close question.  The parties'

writings and their testimony diverge widely.  Nevertheless, the following evidence leads to a

conclusion that the sale should be treated as a "corporate" rather than an individual transaction.

The First Agreements were all signed by Boaziz in a representative capacity, "President,"

of the LLCs.  According to Boaziz's own testimony, Levy did not want to share in any liability for

any of the companies' debts.[29]  He simply wished to invest and to have a two-thirds interest in the

properties.  The body of the First Agreements states that Levy will become a two-thirds owner of

---

[26]  *City of Wichita, Kan. v. Southwestern Bell Telephone Co.,* 24 F.3d 1282, 1287 (10th Cir. 1994) (Where contract is ambiguous, extrinsic evidence and rules of construction may be considered to ascertain the intention of the parties); *Williamson v. Kay (In re Villa West Associates),* 146 F.3d 798, 803 (10th Cir. 1998) (Two or more instruments that are executed by the same parties at or near the same time in the course of the same transaction and concern the same subject matter will be read and construed together to determine the intent of the parties.); *Wichita Investors, L.L.C. v. Wichita Shopping Center Associates, L.P.,* 267 F. Supp. 2d 1049, 1052 (D. Kan. 2003) (Extrinsic evidence of parties' intent is admissible when terms of agreement are ambiguous).

[27]  *In re Villa West Associates*, 146 F.3d at 803.

[28]  *Time Warner v. Everest Midwest Licensee*, 381 F.3d 1039, 1045 (10th Cir. 2004).  *See Dkt. 127*, Stipulation of Facts, ¶ 6.

[29]  *See* KAN. STAT. ANN. § 17-7688(a) (2004 Supp.) (A member is not personally liable for debts of the LLC solely by virtue of being a member of the LLC.).

19

the LLCs. The funds being transferred are to be used to buy out the former "partners" Topaz and Franco. On November 22, 2001, Boaziz issued a receipt to Levy that states that for value received, Boaziz assigned a two thirds interest in all three LLCs to Levy, even though he had no such interest to convey.[30]    The Second Agreements provide that Levy will be issued certificates of ownership in the LLCs. Taken together, these facts suggest that what transpired was akin to a sale of treasury stock:   Boaziz used Levy's money to regain Topaz and Franco's interests and the LLCs conveyed them to Levy.[31]

To reach the opposite conclusion – that Boaziz sold *his* interests to Levy – would require a finding that Boaziz had interests to sell. He plainly did not, at least until 2003 when Topaz and Franco transferred their interests back to him. The Court would also have to construe the First Agreements as a personal agreement between Boaziz and Levy, belying Boaziz's representative signature. The provisions in the Second Agreements that require Boaziz to cause the issuance of certificates of ownership to Levy would have to be disregarded. Of course, finding that the sale was personal would be somewhat consistent with Levy's informal approach as well as his agreement to pay all the money to Boaziz rather than the LLCs. In any event, Boaziz's counsel, Jones, drafted the Second Agreements and it is more likely than not that Boaziz drafted the First Agreements. Moreover, Boaziz enjoyed a strong language advantage over Prosper because Boaziz speaks both English and Hebrew while Prosper relied on Boaziz and, to some extent Oved, to translate and interpret the provisions of the agreements from English to Hebrew. Finally, Boaziz enjoyed the trust and confidence of Prosper, having connected with him on a religious, cultural, and familial basis.

---

[30]  Ex. 29.

[31]  *See* KAN. STAT. ANN. § 17-76,112(e) (2004 Supp.) (authorizing a LLC to acquire a member's interest in the LLC).

All of these factors allow the Court to resolve any contractual ambiguities (and there are many) against Boaziz and in favor of Levy.

In short, the Court concludes that the First Agreements were for the issuance of LLC interests by the LLCs to the Levy group.

B.    The Second Agreements[32]

Boaziz further contends that the May, 2002 Agreements replaced the First Agreements and that the Second Agreements are consistent with his argument that the First Agreements were a sale of Boaziz's personal interest. In fact, Boaziz argues that the Second Agreements can only be read consistently with the First Agreements if they are construed as a sale of a personal interest. To the extent the First Agreements are inconsistent with the Second Agreements, Boaziz argues that under contract law, the prior inconsistent writings were extinguished by the Second Agreements. Nonetheless, Boaziz acknowledges that ambiguity remains in the parties' global agreement even after construing the First and Second Agreements together.[33]

The Court applies the same principles of contract law to the Second Agreements as it applied to the First Agreements, whether the Second Agreements are characterized as new contracts or as modifications of the First Agreements.[34] What is noteworthy in this regard is the fact that Boaziz's

---

[32] Ex. 56, 57, and 58.

[33] *Dkt. 116,* Trial Brief, p. 12 ("The Court is faced with an original contract and a substitute contract which, even after being construed together, leave ambiguities in the terms of the global agreement.").

[34] *See Gill Mortuary v. Sutoris, Inc.*, 207 Kan. 557, 485 P.2d 1377 (1971) (mutuality is required in order to amend the terms of a contract and one party cannot unilaterally change its terms); *Amoco Production Co. v. Hugoton Energy Corp.*, 11 F. Supp. 2d 1270 (D. Kan. 1998) (Under Kansas law, an agreement to modify a contract is itself a contract); *Saddlewood Downs, L.L.C. v. Holland Corp., Inc.*, 33 Kan. App.2d 185, 99 P.3d 640 (2004) (Whether a term of a written contract has been modified by a subsequent agreement is a question of fact for the trial court); *Idbeis v. Wichita Surgical Specialists, P.A.*, 279 Kan. 755, 112 P.3d 81 (2005)

21

attorney prepared the Second Agreements under direction from Boaziz. Any ambiguities in the Second Agreements will be strictly construed against Boaziz. Boaziz's attorney was completely unaware of the November and February transactions between Boaziz and Levy or the existence of the First Agreements. Not surprisingly, then, no reference is made in the Second Agreements to the First Agreements. The Second Agreements erroneously recite that Boaziz is the sole owner of the LLCs. The Second Agreements further provide that "Boaziz agrees to sell to Levy and Levy agrees to purchase from Boaziz a 67% interest in and to the said LLC . . ."[35] This, of course, was impossible since Boaziz did not have the ownership interest to convey to Levy. Boaziz's attorney never discussed the purchase of an interest in the LLCs with Oved or the Levys.

Even more compelling is the undisputed testimony from Rosa Levy and Oved that the purpose of the Second Agreements was to divide the Levy percentage interest among Prosper Levy and his family members. Both Rosa and Oved gave credible testimony that Prosper sought to divide his interest among his children and that the purpose of the Levys' May visit to Wichita was to meet with an immigration attorney to inquire about obtaining a work visa for one of the children to become knowledgeable with Prosper's investments in the States. Oved credibly testified that Prosper directed Boaziz to divide Prosper's ownership interest among his family members and that

_____

(Modification of a contract, like the creation of an original contract, requires a mutual assent or a meeting of the minds.)

[35] The Court also observes that the Second Agreements contained no purchase price, an essential term of a contract. This leads the Court to believe that the parties did not intend to make a 'new deal.' *See Hoxeng v. Topeka Broadcomm, Inc.,* 911 F. Supp. 1323 (D. Kan. 1996) (In order for parties to form a binding contract, there must be a meeting of the minds as to all the essential terms.); *Augusta Bank & Trust v. Broomfield*, 231 Kan. 52, 643 P.2d 100 (1982); *Augusta Medical Complex, Inc. v. Blue Cross of Kansas, Inc.*, 227 Kan. 469, 608 P.2d 890 (1980) (To modify existing agreement, agreement to modify must be supported by independent consideration.); *Cimarron Feeders v. Bolle,* 28 Kan. App. 2d 439, 17 P.3d 957 (2001) (The presumption that a written instrument is supported by consideration may be overcome by production of substantial competent evidence.).

Boaziz assured the Levys that he would carry out their wishes. Boaziz did not refute this evidence. The Court concludes that the sole intent of the Second Agreements was to effectuate this division, nothing more and nothing less. A simple assignment of Prosper's interest to his children and Oved would have effectuated the division of his ownership interest.[36]

The Court questions whether the Second Agreements were binding contracts.[37] While they pertained to the same subject matter (the three hotels), it is apparent to the Court that another sale of a two-thirds interests in the LLCs was not within the contemplation of the parties nor possible, the sale having occurred some six months earlier. Levy had already paid the $9.2 million investment under the First Agreements by the time the Second Agreements were executed. According to both Oved and Prosper's son, Henri, there were no discussions between Boaziz and Levy about changing the First Agreements. The extrinsic evidence was persuasive and unrebutted that Prosper Levy simply intended to divide his two-thirds interest in the LLCs among his family. Boaziz sent the Second Agreements to Prosper and represented to him that the Second Agreements accomplished this objective and Prosper signed the Second Agreements with this understanding. Boaziz did not translate the Second Agreements or tell Prosper anything about the content of the document other than the division of shares. Oved did not review the Second Agreements nor was he present with Prosper Levy when he signed the Second Agreements; Oved first saw the Second Agreements a few weeks after Prosper signed them. In short, the only mutual assent that existed was for a division of Prosper's shares.

Even if this Court were to conclude that the Second Agreements were binding contracts, it

---

[36] *See* KAN. STAT. ANN. § 17-76,112 (2004 Supp.); Ex. 2, 3, and 4, Art. VII, Transfer of Interests. There was no evidence presented that Boaziz opposed the division of Prosper's two-thirds interest in the LLCs among Prosper's family.

[37] *See* notes 34 and 35, *supra.*

23

is persuaded that this is an appropriate case to reform the Second Agreements to comply with the intended division of Prosper's interests. In reaching this conclusion, the Court is particularly swayed by what it considers to be unique factual circumstances -- the inequitable conduct of Boaziz, who enjoyed a near familial relationship with Levy by reason of their cultural and religious connections, and whom Levy relied upon to overcome his language barrier. Boaziz knew better than anyone that the Second Agreements contained an inaccurate recital of his sole ownership of the LLCs and the previous sale of a two-thirds interest in the LLCs. He either failed to inform his attorney of the First Agreements (the likely scenario) or failed to bring to his attorney's attention, the misstatements in the Second Agreements. Either way, Boaziz has conducted himself in an inequitable fashion and taken advantage of Levy's trust in him. He alone gave the direction to his attorney to draft the Second Agreements and it is apparent from the final product and Jones' testimony that Boaziz gave directions contrary to Levy's intent to accomplish a mere division of Prosper Levy's interest in the LLCs.

Reformation permits a court to modify a written agreement to reflect the actual intent of the parties. The Court's review of the law of reformation in Kansas permits the Second Agreements to be reformed. In a somewhat analogous situation in *Andres v. Claassen*[38] the trial court reformed a deed to exclude a tract of land from the conveyance in order to reflect the true intention of the parties. The Kansas Supreme Court recognized and applied the following rule:

> It has long been the law that a written instrument may be reformed where there is ignorance or a mistake on one side and fraud or inequitable conduct on the other, as where one party to an instrument has made a mistake and the other knows it and fails to inform him o fthe mistake or conceals the truth from him. Where, unknown to one of the parties, an instrument contains a mistake rendering it at variance with the prior understanding and agreement of the parties, and the other party learns of this mistake at he time of the execution of the instrument and later

---

[38] 238 Kan. 732, 714 P.2d 963 (1986).

24

seeks to take advantage of it, equity will reform the instrument so as to make it conform to the prior understanding . . .

> The Kansas cases have long adhered to the principle that an instrument may be reformed where there is ignorance or mistake on one side and fraud or inequitable conduct on the other. Silence by one party to a contract, with knowledge that the other party is mistaken and that the instrument as written does not express the true intention of the parties, may constitute a misrepresentation amounting to constructive fraud.[39]

The trial court found that the sellers in *Andres* never intended to sell a reversionary interest they had in a tract of real estate and the buyer knew it. The buyer took the contract to his attorney and had language placed in the contract to include this tract not negotiated or discussed by the parties. The buyer then remained silent when the deed was executed. Under these circumstances the Kansas Supreme Court had "no hesitancy" in affirming reformation of the deed.[40] So too, here, the Court concludes that the Second Agreements should be reformed to show only the division of the 67 percent interest held by Prosper Levy.

C.      The "Final Final" Agreement

Finally, Boaziz claims yet another later contract was created by the parties sometime in June of 2002. He contends that this was the "final, final agreement." The only documentary support for this agreement were summaries prepared on each of the hotels.[41] The Court is highly skeptical of any such "final deal" in June that altered the First Agreements. They are undated and unsigned by the Levy Group. There was no evidence that the Levy Group ever saw or discussed the summaries with Boaziz. Even Boaziz's accounting expert testified that he was unaware of any such agreement and did not consider it in the preparation of his report. In short, the evidence is wholly lacking of

---

[39] *Id.* at 740.

[40] *Id.* at 741. *See also Russell v. Ely*, 133 Kan. 318, 299 Pac. 619 (1931).

[41] Ex. 62, 63 and 64.

25

any mutual assent or meeting of the minds and the Court concludes that no agreement was reached between the parties in June of 2002.[42]

        D.        The Alternative Accounting Views of the Transactions

The Court had the benefit of drawing upon well-reasoned expert reports, offered by two prominent, local certified public accountants. The LLCs' expert, Gary Gibbs, presented a report that assumed that the sale of the hotel interests was an acquisition, based on cost, of interests from the LLCs. Boaziz's expert, H.K. "Dick" Dameron, offered two scenarios, the most persuasive of which allows for Boaziz selling a portion of his interest in the companies to Levy (presumably after reclaiming it from the old partners), claiming a profit on that sale, and giving Boaziz credit for investing that profit as part of his capital obligation. As noted above, both accountants rely extensively on the work of Boaziz's Miami accountant, Ronen Ben-Haroush, for their renditions of what Boaziz injected into the LLCs. But because the theoretical approach of the accountants is so different, the bottom lines differ greatly, at least in magnitude. Where Gibbs and Dameron agree is this: Boaziz has overpaid capital into the Broadview Radisson but he is woefully short of his capital obligations on the other two properties.

The "cost" theory advanced by the LLCs assumes that Levy and Boaziz intended to acquire and operate the hotels by paying into the ventures enough money to purchase the properties, secure appropriate renovations, and cover operating losses during the renovation periods. Gary Gibbs testified that he gave no consideration to Boaziz taking a profit on the resale of the Topaz and

---

    [42] Nor do these summaries qualify as a capital call. There was no credible testimony that a capital call was made prior to the LLCs' bankruptcy petition. Under the operating agreements for the Radisson and Ramada, members holding an 80% interest in the LLC controlled the ability to make a capital call. *See* Ex. 2, Sec. 3.03. and Ex. 3, Sec. 3.03. The operating agreement for the Sheraton gave Boaziz as manager of the LLC the absolute discretion to make capital calls. *See* Ex. 4, Sec. 3.03.

Franco interests in the Broadview and Ramada. Instead, in drafting his report, he relied on the Levys' assertion that they paid their investment directly to Boaziz with the intention that he would invest their money in the LLCs. The amount of the money they paid him was to be initially determined by the First Agreements which, in turn, seem to follow the logic of the October, 2001 letter and the hand-written pro formas authored by Oved at the initial November, 2001 meetings. In other words, Levy was obligated to pay in at least $9.2 million to buy his two-thirds share in the three properties, with additional funds being paid to cover mortgage buyouts and renovations. At Boaziz's urging, Levy paid this money to Boaziz who, in turn, paid at least some of it into the LLCs.

Had Levy's funds been paid directly to each LLC for the same purpose, the task of accounting for capital (the LLCs' duty under the Operating Agreements) would have been far easier and the "deal" much more straightforward. Instead, Levy's funds were held by Boaziz. In Gibbs' attempt to give adequate capital credit to both parties, he proposes that payment of the LLCs' funds to Boaziz created an account receivable by the LLCs from Boaziz. Under this interpretation, Boaziz receives a credit on this receivable for funds he pays into the LLCs. He also receives credit for funds of his own paid directly to vendors for the LLCs' benefit. Gibbs takes as correct Ben-Haroush's accounting of what Boaziz paid in from his own moneys. On a year to year basis, Gibbs then reconstructs the capital accounts by crediting Boaziz's cash infusions to Boaziz's capital account. Payments by Levy to Boaziz are credited to Levy's capital and debited against Boaziz's account receivable. As the Levy contributions increase, but are not paid out by Boaziz, the account receivable debit balance grows. To the extent the Levy contributions are not paid into the LLCs, Gibbs imputes interest payable on the receivable at the Kansas prejudgment interest rate of ten percent per year.[43] Each member's capital account is then charged with the member's proportional

---

[43] *See* KAN. STAT. ANN. § 16-201 (1995).

share of the profits or losses of the company. In each of these three cases, the properties generally experienced losses. At the end of each accounting year, Gibbs calculates the extent of a capital shortfall or overage in each of Levy's and Boaziz's capital account and, in order to maintain the capital at the appropriate two-thirds and one-third ratio, he calculates what contribution or distribution is necessary from or to each member to maintain that ratio. To the extent a contribution is necessary, a further debit is made to the member's "account receivable." Likewise, if a distribution is necessary, that amount is credited to the member's account receivable.

These reconstructions of the capital accounts are found at exhibits C and D to Gibbs' report.[44] The 'Exhibit C reports' contemplate the two-thirds and one-third relationship of Levy and Boaziz without regard to the Levy loan to Boaziz carrying the additional 13 percent necessary to fund Boaziz's one third share. In the Court's view, the effect of this treatment is to posit that Levy contributed 80 percent while Boaziz contributed only 20 percent to capital. Even though Levy was to lend the additional 13.33 percent to Boaziz, Boaziz would receive no credit for contributing his funds borrowed from Levy. Thus, Boaziz would have less capital to absorb operating or other losses and his capital accounts would necessary be lower. A logical consequence of accepting this interpretation would be to force Boaziz to pay to the *companies* funds he owes to Levy in what is essentially an oral side agreement between Boaziz and Levy.

The 'Exhibit D reports' credit Boaziz with injecting the loaned capital. By doing this, Boaziz accumulates more capital to absorb operating or other losses. This increases his capital balances and leaves his personal obligation to Levy outside the companies' accounts. This more accurately reflects the Court's understanding of the arrangement among Boaziz, the LLCs, and Levy.

---

[44] Ex. 160.

28

Based upon the analysis in the 'Exhibit D reports,' as of December 31, 2004, shortly after these chapter 11 cases were filed, Boaziz would have been entitled to a capital credit in the Broadview Radisson of $3,114,475.[45] Per the same reports, Boaziz would be required to pay additional capital into the other two companies, $3,070,263 to the Ramada and $3,491,683 to the Sheraton.[46]

The Dameron report advanced by Boaziz takes a different approach.[47] Dameron views what transpired between Levy and Boaziz as follows: Boaziz brought the hotels and Levy brought the money. By starting from this premise, Dameron posits that, as Levy paid money to Boaziz, a hypothetical "escrow" was created out of which Boaziz made capital contributions. An important distinguishing attribute of Dameron's theory is that he proposes Boaziz is entitled to start with the capital accounts he brought with the hotels as expressed in the tax returns. These accounts include in Boaziz's account the net book value of each hotel at the inception of the Boaziz-Levy relationship. These book values include the funds Boaziz paid to Topaz and Franco to recover their two-thirds interest in the Broadview and the Ramada.

Dameron posits that each Levy payment is debited to the hypothetical escrow. Credited against the escrow is each payment made by Boaziz, whether to Topaz and Franco to acquire their interests, or to the companies for renovations or other uses. Dameron's numbers are taken from Ben-Haroush's "inside and outside" capital reports.[48] The effect of this treatment is to substantially increase Boaziz's starting capital position, but also to assume that any money contributed by Boaziz

---

[45] Ex. 160, Exhibit D, page 3.

[46] Ex. 160, Exhibit D, pages 4-5.

[47] Ex. 134.

[48] Ex. 122.

came from Levy. By not employing the receivable theory, no interest accrues on the funds Boaziz

holds because, as Dameron testified, he did not intend to recreate a cash-basis accounting. Rather,

he attempted to determine the relative capital accounts of Levy and Boaziz based on adding their

respective contributions and subtracting distributions and losses. He characterized this treatment

as a "capital allocation," not a cash calculation.[49]

Part of the assumption that Boaziz contributed one hundred percent of the hotels is based on

Ben-Haroush's crediting Boaziz with an overall capital contribution of some $5.5 million which

includes Franco and Topaz's capital.[50] According to Dameron, Ben-Haroush assumed that Levy

paid $9.2 million for the two-thirds interest in the companies and that only his subsequent payments

should be treated as capital contributions. By giving this assumption validity, Boaziz's capital is

increased by the "profit" he made when he sold two-thirds of the properties to Levy for $9.2 million,

but only had to expend $4.095 million to buy out Topaz and Franco.[51]

Dameron concludes that Boaziz has overpaid capital into the Broadview, having a capital

account of $2.279 million (47.9 percent) versus Levy's capital of $2.475 million (52.1 percent). [52]

---

[49] Tr. III, p. 38.

[50] *See* Ex. 134, note 2 to Ex. A, B and C (net book value of $3,734,120 for Broadview Radisson + net book value of $994,739 for Ramada + net book value of $784,758 for Sheraton). *See also,* Dkt. 125, Stipulation of David Adams' Testimony, ¶ 5 where accountant who prepared 2001 tax returns for the LLCs testified to Boaziz's capital accounts in each of the LLCs as shown on the returns.

[51] *See* Ex. 122, note 3 and Ex. 134, note 4 to Exhibits A and B.

[52] Dameron noted in his testimony that the figures for the cash contributed by Levy contained in his report were off by $160,000 as they relate to the Broadview Radisson and Ramada because he intended to allocate a purchase price of $4,560,000 rather than $4,400,000 to the Radisson and a purchase price of $1,840,000 rather than $2,000,000 to the Ramada. *See* Ex. A and B attached to Ex. 134. Dameron intended to use the figures from Ex. 19 for his allocation of the $6.4 million price under the November Agreement. The Court accepts Dameron's explanation and uses the 'adjusted' figures here.

30

Levy is therefore significantly under-invested in the Broadview. By contrast, Boaziz is under-invested in the Ramada, having a net capital of only $264,125 (11.5 percent) as opposed to Levy's capital of $2.043 million (88.5 percent). And, in the case of the Sheraton, Boaziz's capital account is -139,430 (-10 percent) while Levy's is $1,522,964 (110 percent).

Dameron's suggested tax treatment of the parties' transaction is credible. Moreover, both accountants reach a similar conclusion: that Mordechai Boaziz is under-invested in two of the three LLCs and over-invested in the third. But Dameron's treatment assumes a personal purchase of the LLC interests by Levy from Boaziz, rather than a purchase of the interests from the LLCs themselves. This does not conform to the weight of the evidence.

The evidence is overwhelming that Levy reposed great trust and confidence in Boaziz. Boaziz had forged a close personal relationship with Mr. and Mrs. Levy. On the strength of that relationship, Levy paid Boaziz himself over $14 million without asking anything more than periodic reports of the properties' progress. Boaziz and Levy were to be the "partners" in renovating and operating the hotels that Boaziz had obtained at a bargain price in foreclosure. The extent of Levy's investment was determined by adding the acquisition costs, the mortgage amounts, the renovation costs and the anticipated "carry." With Levy's "reimbursement" of the purchase price of the hotels, he and Boaziz should have begun accounting for the companies' activities on a clean slate. There is nothing in the record to indicate that they ever discussed Boaziz carrying forward his previous capital account or even the manner in which Boaziz had accounted for the properties to date for tax purposes. Indeed, taxes were not discussed at all until Henri Levy entered the picture some two years after the First Agreement was signed. To the extent that Boaziz was to profit, that profit was defined in the First and Second Agreements as a ten percent override on the operational profits of the hotels and whatever gain the companies might realize on the sale of the hotels. Nothing

31

whatever in the record suggests that Boaziz was entitled to, or even negotiated for, any other profit. Therefore, the Court cannot now decide that he was entitled to a profit on the repurchase of the Franco and Topaz interests, nor can it give weight to Dameron's hypothesis that Boaziz carried his capital forward. Convinced that this was a "cash deal," the Court concludes that the Gibbs analysis most closely reflects the transaction between Levy and Boaziz as revealed in the documents and in testimony.

The Court is also persuaded that the account receivable theory advanced by Gibbs best reflects what actually transpired. Levy's trust and confidence in Boaziz led him to pay all of his investment to Boaziz directly, rather than through the LLCs. As the manager of the LLCs, Boaziz had a cluster of duties, both to the LLCs and to Levy. According to Kansas law, the manager is the agent of the LLC and his acts bind the company.[53] As a manager and member, Boaziz could contribute and share in the profits and losses of the LLCs, but he clearly had all of the restrictions and liabilities of a manager and a member, except as varied by the Operating Agreements.[54] Moreover, by virtue of the trust and confidence placed in him by Levy and his duties under the Operating Agreements, Boaziz occupied a position of superior knowledge and influence in relation to Levy and the LLCs. Whether he used or misused the funds paid him by Levy, he was duty bound to place the interests of the LLCs and Levy above his own interests. As a fiduciary, he had a duty to expend the funds he received from Levy for the benefit of the LLCs, whether those expenditures were for acquisition, debt payment, purchase of third party interests, renovations, or operating

---

[53] KAN. STAT. ANN. § 17-7693(a) (2004 Supp.).

[54] KAN. STAT. ANN. § 17-7694 (2004 Supp.).

32

costs.[55]  The terms of the Operating Agreements specify that "the Manager shall always conduct the

business of the Company in a manner consistent with the best interests of the Members and the

Company."[56]

Boaziz argues that the Operating Agreements insulate the Manager from claims of the

companies and the members when those claims arise out of the manager's acts or omissions, but

only if the manager acted in good faith and in the best interests of the company and if the conduct

of the manager did not amount to actual fraud, gross negligence, or willful or wanton misconduct.[57]

More precisely, section 5.03 of the Operating Agreements exonerates a Manager from liability if

> . . . (a) the Manager . . . acted in good faith *and in a manner he reasonably believed to be in, or not opposed to, the interest of the Company,* and (b) the conduct of the Manager . . . did not constitute actual fraud, gross negligence, or willful or wanton

---

[55]  The facts and circumstances of Boaziz's and Levy's relationship and the subject transaction present a classic example of when a fiduciary duty ought to be implied under Kansas law.  Those principles were summarized in *Denison State Bank v. Madeira*, 230 Kan. 684, 692, 640 P.2d 1235 (1982): "A fiduciary relationship imparts a position of peculiar confidence placed by one individual in another. A fiduciary is a person with a duty to act primarily for the benefit of another. A fiduciary is in a position to have and exercise, and does have and exercise influence over another. A fiduciary relationship implies a condition of superiority of one of the parties over the other. Generally, in a fiduciary relationship, the property, interest or authority of the other is placed in the charge of the fiduciary."

[56]  Ex. 2, § 5.02(B); Ex. 3, § 5.02(B) and Ex. 4, § 5.02(B).   The Operating Agreements here did not restrict Boaziz's fiduciary duties to the LLCs or other members; nor does Boaziz claim that he was acting in good faith reliance upon the provisions of the Operating Agreement. *See* KAN. STAT. ANN. § 17-76,134(c)(2004 Supp.).  If anything, the Operating Agreements restate a manager's common law fiduciary duty. *See generally,* Edwin W. Hecker, Jr., *The Kansas Revised Limited Liability Company Act,* 69 J. KAN. B. ASS'N 16, 32-34  (Nov/Dec 2000). *See also, Cimarron Feeders v. Bolle,* 28 Kan. App. 2d 439, 448, 17 P.3d 957 (2001) (recognizing a fiduciary duty among LLC members akin to the fiduciary duties among partners in a partnership); *Carson v. Lynch Multimedia Corp.*, 123 F. Supp. 2d 1254 (D. Kan. 2000) (minority member of LLC stated a claim for breach of fiduciary duty versus majority member's parent's president.).

[57]  Ex. 2, § 5.03; Ex. 3, § 5.03 and Ex. 4, § 5.03.

33

misconduct.[58]

Acts or omissions done in reliance upon counsel or accountants are conclusively presumed to be done in good faith.[59]

At the same time, Kansas law implies into every contract a covenant of good faith and fair dealing.[60]  The duty of good faith and fair dealing required Boaziz to refrain from intentionally doing anything that had the effect of injuring Levy's right to receive the fruits of the contract (*i.e.* the First Agreements).[61] This included Boaziz's duty to faithfully and fairly applying Levy's funds in the hotels as agreed.[62]  Even in the face of broad exculpatory language such as that contained in these Operating Agreements, the duty to act in good faith, particularly in the present circumstances where Boaziz personally assumed control over Levy's funds, required Boaziz to make complete and accurate reports to the members concerning the status of the LLCs and to expend Levy's payments in a manner consistent with the parties' agreement and the LLCs' best interests.  Because Levy essentially placed himself at Boaziz's mercy, this Court is inclined to resolve whatever ambiguities there are in the First and Second Agreements in favor of the LLCs and against Boaziz.  The funds paid by Levy to Boaziz were intended for use by the LLCs.  Therefore, positing an indebtedness by

---

[58] *Id.*

[59] *Id. See also,* KAN. STAT. ANN. § 17-7697 (2004 Supp.).

[60] *Kansas Baptist Convention v. Mesa Operating Ltd. Partnership*, 253 Kan. 717, 725-26, 864 P.2d 204 (1993) (Under Kansas law, duty of good faith and fair dealing implied in all contracts except employment at will contracts.).

[61] *Lone Star Steakhouse and Saloon, Inc. v. Liberty Mut. Ins. Group*, 343 F.Supp. 2d 989, 1010-11 (D. Kan. 2004).

[62] *Professional Service Industries, Inc. v. Kimbrell*, 834 F. Supp. 1305, 1310 (D. Kan. 1993) (Duty of good faith and fair dealing implied in contracts applies to the performance of the contract.).

34

Boaziz to the LLCs (the account receivable) for the funds received, augmented by his share of the LLCs' losses, is an entirely logical way to view these transactions.

E.  Determining the Appropriate Capital Accounts: Collection of Shortfalls versus Dilution of Interests:

Concluding that Boaziz has a considerable obligation to the Ramada and Sheraton hotels does not end the inquiry. Nor is it possible for the Court to offset what Boaziz is owed by the Broadview against his obligations to the other LLCs because the three bankruptcy estates have not been substantively consolidated.

The LLCs argue that they are entitled to collect from Boaziz the amount of their "accounts receivable" from him, with legal interest. They argue that these claims are assets of the LLCs' bankruptcy estates to be administered for the benefit of the other creditors. Boaziz argues that the Court should declare the respective capital percentages of the Levy group and Boaziz, order the properties sold, and distribute whatever remains to the respective parties in the appropriate proportions. Only by resorting to the Kansas Revised Limited Liability Company Act (KRLLCA)[63] and the Operating Agreements[64] may the Court resolve this issue.

The KRLLCA suggests that a member is obligated to a LLC to perform any promise to contribute cash.[65] The LLC may enforce that obligation. Operating agreements may provide for a

---

[63] KAN. STAT. ANN. § 17- 7662 to 76,142 (2004 Supp.). The KRLLCA became effective January 1, 2000 and is applicable to the LLCs formed by Boaziz in this case. *See* KAN. STAT. ANN. § 17-76,140.

[64] Ex. 2, 3, 4.

[65] KAN. STAT. ANN. § 17-7694 recognizes that a manager who is also a member of an LLC may make contributions like other members and is subject to the same rights and liabilities as other members; KAN. STAT. ANN. § 17-7699 (form of contribution to a LLC may be cash, property or services); KAN. STAT. ANN. § 17-76,100(a) states that unless the operating agreement provides otherwise, a member who has agreed to make a contribution is obligated to the LLC to

number of sanctions for non-contributing members, including, but not limited to dilution of a member's interest and the forced sale of the interest for the benefit of the company.[66]  The Broadview  and Hospitality Operating Agreements provide that no member shall be required to make capital contributions after the initial contribution unless all the members consent.  Yet upon the vote of 80 percent of the interests outstanding, a capital contribution may be requested and those who choose to participate in payment of capital are entitled to have the interests of non-contributing members diluted by adding to each contributing member's percentage ten percent of his or her new contribution.[67]  The Realty Operating Agreement states that the manager shall have absolute discretion in determining both the amounts and the timing of the capital contributions.  If the other members fail to contribute, the manager is permitted to dilute the non-contributing members' interests.[68]

Here, there is no evidence that any capital calls were made after the First Agreements, either by the manager in respect to the Sheraton or by 80 percent of the interests in respect to the Broadview Radisson or the Ramada.  In making this finding, the Court recognizes the testimony of Oved, Henri Levy, and Boaziz that each demanded money from one or both of the others from time to time.  But none of the demands was delineated as an additional capital call or invoked the provisions of the Operating Agreements.[69]  None of the purported demands is documented in

---

perform "even if the member is unable to perform because of death, disability or any other reason."

[66]  KAN. STAT. ANN. § 17-76,100(c).

[67]  Ex. 2 and 3, § 3.03 (A*dditional* capital contributions).

[68]  Ex. 4, § 3.03 (*Additional* capital contributions).

[69]  Although Boaziz never provided the Levy Group with a copy of the three Operating Agreements, they were bound by the terms of the Operating Agreements upon becoming

36

writing. Therefore, it is not apparent to the Court that additional capital contributions were demanded, and the Court cannot implement the dilution provisions of the Operating Agreements and must instead determine that the LLCs are entitled to enforce and collect capital shortfalls from the members who are "short" as judgments. This liability is provided for by the KRLLCA, is enforceable by the LLCs, and is not excepted by the Operating Agreements.[70]

Thus, Boaziz has a claim in the Broadview (Radisson) bankruptcy in the amount of $3,114,475, while Hospitality (Ramada) and Realty (Sheraton) may collect from Boaziz his respective shortages of $3,070,263 and $3,491,683.[71] Having received no evidence of it at trial, the Court makes no findings concerning what capital contributions may have been made by the parties after the petition dates. And, as noted above, the Court makes no finding concerning the extent of Boaziz's liability to Levy for Levy's advancing 13.33 percent of Boaziz's investment in the three properties. This liability can be determined in either the third party proceeding pending in this adversary proceeding or in another forum.

V.     Conclusion

In conclusion, based upon the evidence received at trial and the forgoing analysis, the Court declares that the Levy Group has a 66.67 percent distribution interest[72] in each of the three LLCs and that Mordechai Boaziz has a 33.33 percent distribution interest. Boaziz shall have an allowed unsecured claim in the Broadview Hospitality Holdings LLC (Radisson) bankruptcy case in the

---

members. *See* KAN. STAT. ANN. § 17-7663(g)(1)(B) and (g)(2).

[70] KAN. STAT. ANN. § 17-76,100(a)

[71] Ex. 160, Exhibit D.

[72] This percentage distribution interest in each LLC is allocated among the Levy Group as follows: Prosper Levy - 10%; Rosa Levy - 10%; Henri Levy - 10%; Jacques Levy - 10%; Danielle Levy - 10%; Yaffa Levy - 7%; and Ovadia Oved - 10%. *See* Ex. 56, 57 and 58.

amount of $3,114,475 which amount shall not, per 11 U.S.C. § 502(b)(2), bear interest. Boaziz is indebted to Wichita Hospitality Holdings, LLC (Ramada) in the amount of $3,070,263, his capital shortfall. Boaziz is indebted to Wichita Realty, LLC (Sheraton) in the amount of $3,491,683, his capital shortfall.

Wichita Hospitality and Wichita Realty are entitled to interest at the legal rate of 10 percent per annum accruing on the unpaid principal balance of the shortfalls until paid. The Court understands Gibbs' report to include 10% interest accrued on the unpaid balance of Boaziz's receivable *to Levy* for the 13.33% carried by Levy. It also includes 10% interest accrued on the unpaid balance of Boaziz's receivable to the LLCs.[73] As noted above, the Court makes no finding concerning Boaziz's liability to Levy for the 13.33% carry. Nor does this Court by its ruling today intend to award interest on top of interest with respect to the LLCs' receivable from Boaziz. Due to the inclusion of this interest component, the Court questions whether some adjustment to the amounts of Boaziz's shortfalls and his allowed unsecured claim stated above may be necessary in order to arrive at the principal balance. The parties are directed to provide to the Court within seven (7) days of the date of this Memorandum the principal balances of Boaziz's shortfalls and claim (using Mr. Gibbs' Exhibit D Report) or to otherwise justify why interest of 10% should accrue on the figures provided by Mr. Gibbs in his Exhibit D Report. Such submissions shall be limited to 5 pages in length. The Court will withhold issuance of its Partial Judgment on Decision until it receives these additional submissions from the parties.

This Court reserves the third party complaint of Boaziz against Levy and other third party defendants. The Clerk shall set that matter for discovery conference as soon as the Court's schedule permits. Discovery shall commence and continue notwithstanding the pendency of the Levy

---

[73] *See* Ex. 160, Ex. D Report, notes 15 and 20.

Group's motion to dismiss.

The Chapter 11 cases of each debtor LLC shall be set for status conferences pursuant to § 105(d) immediately, at which time the debtors shall appear and advise the Court when they will be proceeding to formulate and file plans of reorganization. Boaziz shall appear and advise the Court concerning his intended course of action in the bankruptcy cases, all appearances to be through counsel.

IT IS SO ORDERED.

# # #